UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                CASE NO. 18-12729

WOW WEE, LLC                                                          SECTION "B"

    DEBTOR                                                         CHAPTER 11
**************************************************************************
WOW WEE, LLC

    PLAINTIFF

VERSUS                                                                ADV.P. NO. 19-1125

CHARLES F. COMEAUX

    DEFENDANT

## MEMORANDUM OPINION

This matter came before the court on March 11-13, 2020 as a trial on the complaint of the

debtor, Wow Wee, LLC against Charles F. Comeaux ("Comeaux"). The complaint was

consolidated for trial with the debtor's objection to proof of claim number 4 filed by Comeaux.

Because the court finds that the debtor did not carry its burden of proof on its claims made in the

complaint, the complaint is dismissed. As to the proof of claim, the court finds that Comeaux is

allowed a general unsecured claim against the debtor in the amount of $218,705.89.

### I.    Background Facts

The debtor is in the business of producing and bottling sauces for sale in supermarkets

and other retail stores. The debtor is a member managed Louisiana limited liability company.

At its inception, the ownership of the debtor was split between Comeaux, his former spouse, Lois

Lasseigne ("Lasseigne"), and Celeste and Anthony Griffin.[1] Comeaux and Lasseigne were the

---

[1] Initially Lasseigne and Comeaux each had a 37.5% interest, and each of the Griffins had a 12.5% interest in the
debtor.

co-managers of the debtor.  On September 10, 2014, the members of the debtor called a special

meeting and executed an amended operating agreement removing Comeaux as a manager and

leaving Lasseigne as the sole manager of the debtor.  On that same date, Comeaux donated one

percent of his interest in the debtor to Lasseigne. As a result, Lasseigne became the majority

member with a 38.5% interest in the debtor.[2]  On September 9, 2015 Lasseigne filed a petition

for divorce from Comeaux in Louisiana state court.  On September 28, 2018, by consent of the

parties, the state court entered a partial summary judgment against the debtor and in favor of

Comeaux in the amount of $33,000.  This judgment remains unpaid.  The partial summary

judgment also awarded judgment against the debtor in the amount of $153,039.19 and in favor of

Comeaux and Lasseigne.  The parties dispute ownership of that claim, and the state court did not

make a determination of the ownership of that claim.  The $153,039.19 was for repayment of

two loans made to the debtor.[3]

On April 24, 2012 the debtor took out a revolving line of credit from Coastal Commerce

Bank with a maximum of $50,000.  The line of credit was personally guaranteed by Comeaux,

who was a co-manager of the debtor at that time.  The line of credit was increased to $60,000 on

June 8, 2012.  It was renewed twice, on April 24, 2013 and April 24, 2014.  On April 24, 2015 it

was converted to a term loan with an interest rate of 7.5% and a maturity date of April 24, 2018.

On June 1, 2015 the loan was refinanced at a variable rate.  At some point, the debtor became

delinquent on the loan and Coastal made demand for full payment, which the debtor did not

tender.  Coastal then notified Comeaux it would make demand on him, as a guarantor.  Comeaux

---

[2]   At trial, the parties testified that this was so that the debtor would be a woman-owned business, which apparently
would qualify it to get special treatment, although the nature of that special treatment was never specified.
[3]   The joint pre-trial order stipulates that $151,118.19 was loaned from a Capital One Bank account ending in 7547
that was the separate property of Comeaux, but to which Lasseigne was added as an accountholder on September 26,
2013; and $2,521 was loaned from a bank account ending in 5684 that was a joint account.

paid $52,272.19 to satisfy the debtor's obligation to Coastal, and he acquired from Coastal the promissory note, and personal guarantees of the other members of the debtor.

The debtor filed its petition for relief under Chapter 11 of the U.S. Bankruptcy Code on October 12, 2018.  Comeaux timely filed a proof of claim in the amount of $238,911.38.[4]

## II. Legal Analysis

### a. The Adversary Complaint

The adversary complaint asserts claims against Comeaux for breach of fiduciary duty, breach of duty of care and loyalty, tortious interference with the debtor's business operations and relationships, and bad faith filing of a proof of claim.

#### i. Breach of Fiduciary Duty, Duty of Care, and Duty of Loyalty

The debtor alleges that Comeaux breached his fiduciary duty to the debtor.  Fiduciary duty encompasses the duty of loyalty and the duty of care.  Louisiana Revised Statute 12:1314 sets forth the duties of members and managers of a Louisiana limited liability company.[5]  Under

---

[4]  The proof of claim lists the $33,000 judgment, the $153,639.19 judgment, and the $52,272.19 promissory note.

[5]  A. Subject to the provisions of R.S. 12:1315, a member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312:

(1) Shall be deemed to stand in a fiduciary relationship to the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances. Nothing contained in this Section shall derogate from any indemnification authorized by R.S. 12:1315.

(2) In discharging his duties, shall be fully protected in relying in good faith upon the records of the limited liability company and upon such information, opinions, reports, or statements presented to the limited liability company, the members, managers, or any committee thereof by any of the limited liability company's members, managers, employees, or by any committee of the members or managers, or by any legal counsel, appraiser, engineer, including a petroleum reservoir engineer, or independent or certified public accountant selected with reasonable care by the members, managers, any committee thereof, any agent having the authority to make such selection, or by any other person as to matters the member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312, reasonably believes are within such other person's professional or expert competence and which person is selected with reasonable care by the members, managers, any committee thereof, or any agent having the authority to make such selection.

(3) Is not protected by Paragraph (2) of this Subsection if he has knowledge concerning the matter in question that makes reliance otherwise permitted by Paragraph (2) of this Subsection unwarranted.

(4) Shall not be liable for any action taken on behalf of the limited liability company or any failure to take any action if he performed the duties of his office in compliance with this Section.

(5) Shall account to the limited liability company and hold as trustee for it any profit or benefit derived by him, without the informed consent of a majority of the uninterested members in accordance with R.S. 12:1318(C), from

3

subsection (E) of the statute, Wow Wee bears the burden of proving the breach of fiduciary duty

as well as the burden of proving that the breach was the legal cause of damage suffered.  The

statute also provides that a managing member shall not be personally liable for money damages

for breach of his duty unless he acted in a grossly negligent manner, or engaged in conduct

which demonstrates a greater disregard of the duty of care than gross negligence, including but

not limited to intentional tortious conduct or intentional breach of his duty of loyalty.  Subsection

C of the statute defines "gross negligence" as, "a reckless disregard of or a carelessness

amounting to indifference to the best interests of the limited liability company or the members

thereof."

Here, the debtor was a manager-managed limited liability company.  Comeaux and

Lasseigne were initially the managers of the debtor, and so Comeaux owed fiduciary duties to

the debtor.  On September 10, 2014, Comeaux was removed as a manager, leaving Lasseigne as

the sole manager of the company.  Once he ceased to be a manager of the debtor, Comeaux no

longer owed the fiduciary duties of a manager outlined in LSA R.S. 12:1314.  Most of the

---

any transaction connected with the conduct or winding up of the limited liability company or from any personal use
by him of its property unless he proves under strict judicial scrutiny the fairness of the transaction to the limited
liability company.

B. Notwithstanding the provisions of Subsection A of this Section, a member or manager shall not be personally
liable to the limited liability company or the members thereof for monetary damages unless the member or manager
acted in a grossly negligent manner as defined in Subsection C of this Section, or engaged in conduct which
demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional
tortious conduct or intentional breach of his duty of loyalty.

C. As used in this Section, "gross negligence" shall be defined as a reckless disregard of or a carelessness amounting
to indifference to the best interests of the limited liability company or the members thereof.

D. A member or manager who makes a business judgment in good faith fulfills the duty of diligence, care,
judgment, and skill under Subsection A of this Section if the member or manager:

(1) Does not have a conflict of interest with respect to the subject of the business judgment.

(2) Is informed with respect to the subject of the business judgment to the extent the member or manager reasonably
believes to be appropriate under the circumstances.

(3) Rationally believes that the business judgment is in the best interests of the limited liability company and its
members.

E. A person alleging a breach of the duty of diligence, care, judgment, and skill owed by a member or manager
under Subsection A has the burden of proving the alleged breach of duty, including the inapplicability of the
provisions as to the fulfillment of the duty under Paragraph A(2) and Subsection D, and, in a damage action, the
burden of proving that the breach was the legal cause of damage suffered by the limited liability company.

actions that the debtor complains Comeaux engaged in happened after Comeaux was no longer the manager, and thus, there can be no breach of fiduciary duty because Comeaux did not have a fiduciary duty to breach.

Actions that took place while Comeaux was a manager and that the debtor now complains were a breach of fiduciary duty include: 1) giving Coastal Commerce Bank a copy of an invalid operating agreement; 2) executing contracts with brokers; and 3) filing an incorrect tax return on behalf of himself and Lasseigne while they were still married. The debtor fails to demonstrate that it has carried its burden of showing that any of these actions amount to, "a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof." LSA R.S. 12:1314(C). The chief lending officer of Coastal Commerce Bank testified that the operating agreement was not essential to the bank making the loan. Additionally, even though the wrong operating agreement was given to the bank, the debtor received the loan. The debtor has not shown how it was harmed in any way by the use of the invalid operating agreement, whether the use of that operating agreement was intentional, as argued by the debtor, or unintentional, as argued by Comeaux. Put simply, the debtor has not shown the court that the operating agreement made any difference.

The debtor argues that the broker contract Comeaux executed with Schaad while he was a co-manager was harmful to the debtor. Comeaux testified that when he executed the contract, he thought it would help the company grow. The court found this explanation to be reasonable, and the debtor again made no showing that Comeaux exhibited a "a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof," when entering into the agreement.

5

Finally, the debtor complains that Comeaux filed joint tax returns with Lasseigne in 2012 and 2013 that showed the two as 50% owners of the debtor, and failed to give the other two members of the debtor K-1 statements showing their ownership for their taxes.  The debtor has failed to show how it was damaged by this.

The court finds that the debtor has not carried its burden to show Comeaux committed any breach of fiduciary duty, including the duties of care and loyalty, or any damage the debtor suffered as the result of any alleged breach.  The court dismisses those claims.

### ii. Tortious Interference with the Debtor's Business Operations and Relationships

The debtor alleges that Comeaux took many actions after he was no longer a manager that damaged the company, including:  1) telling other companies not to do business with the debtor; 2) repossessing a forklift belonging to Comeaux that had been used by the debtor; 3) refusing to sign a personal guarantee for the renewal of the debtor's equipment loan with Coastal Commerce Bank; 4) refusing to sign a personal guarantee for a business management account with Coastal Commerce Bank; 5) entering the debtor's premises to take business records; 6) entering into a contract on behalf of the debtor without management authority; 7) attempting to start a new company to compete with the debtor; and 8) filing a suit against the debtor in state court.

After Comeaux and Lasseigne divorced, Comeaux informed the bank that he would no longer personally guarantee either the equipment loan for the debtor or the business management account.  The business management account was a sort of factoring agreement between the debtor and the bank whereby the bank took a security interest in the debtor's accounts receivables and advanced the debtor funds before its collection of those receivables.  The chief lending officer for the bank, Chip Ourso, testified that because Comeaux was the only member

of the debtor with enough personal financial resources to qualify for the loans, once he declined

to further personally guarantee the loans, the debtor did not qualify for the loans. He further

testified that Comeaux did not ask the bank to discontinue doing business with the debtor, rather,

the debtor's financial situation was too precarious to qualify for loans on its own. The debtor

does not cite to any authority that refusing to continue to provide a personal guarantee constitutes

tortious interference with a business relationship, and the court declines to find it here. Comeaux

had no obligation to the debtor that required him to continue to put his persona finances at risk to

fund the debtor's operations.

The debtor did show that when the factoring arrangement with the bank ceased, it

attempted to try to find another method of financing, and that Comeaux interfered with that.

Kevin LaBorde, owner of Cashflow Resources, testified that while he was in discussions with

Lasseigne to provide financing to the debtor, Comeaux contacted him and told him that

Lasseigne did not have authority to enter into an agreement with Cashflow Resources. LaBorde

testified that Comeaux represented that he, not Lasseigne, was the manager of the debtor, which

was not true. Comeaux also emailed Kevin LaBorde a copy of the invalid operating agreement

showing Comeaux as the sole manager of the debtor. LaBorde, however, further testified that

after contacting Lasseigne and determining that she was in fact the manager of the debtor, he did

enter into a financing arrangement with the debtor. The debtor could point to no damages it

suffered as a result of Comeaux's actions.

The debtor also showed that Comeaux entered into a contract with a broker called

Waypoint at a time when he was not the manager and had no authority to sign contracts on

behalf of the debtor. Lasseigne testified, however, that although Wayfair attempted to charge the

debtor $1,000, she refused to pay it, and she cancelled the contract once she learned of it.

7

Comeaux testified that he eventually paid Waypoint the $1,000 from his personal funds.  Again, the debtor could point to no damages it suffered as a result of Comeaux's actions.

The debtor also showed, and Comeaux agreed, that he and his son had entered the debtor's premises after hours and removed business records.  Comeaux testified that he wanted copies of the records, so after work (in order not to disrupt business operations) he went by the debtor's facility, and took the records.  He further testified that he took them home, made copies for himself, and then returned them to the debtor's facility.  He testified that Lasseigne knew he had done so and had not objected at the time.  Lasseigne did not dispute this.  The debtor does not show how it was harmed by this activity.

The debtor used a forklift in its operations.  The forklift was purchased by Comeaux and belonged to him.  He allowed the debtor to use it in its operations.  The debtor does not argue otherwise.  The debtor has not shown why Comeaux is obligated to allow the debtor to continue to use his personal property.

The debtor alleges that Comeaux started another limited liability company to compete with the debtor.  Comeaux formed the East 39th Street Sauce Company, LLC on July 31, 2017.  Comeaux testified that he formed the company, but that it never became operational.  The debtor does not show how it was harmed by this activity.

The debtor alleges that Comeaux disrupted its business relationship with its suppliers.  Lasseigne testified that Comeaux contacted many of the debtor's suppliers and told them not to do business with the debtor, and/or that the debtor could not pay its bills.  She testified that this led many suppliers to either discontinue doing business with the debtor or to put the debtor on a cash on delivery payment system which disrupted the debtor's business.  She gave as a specific example that the supplier for mayonnaise refused to continue supplying the debtor with the 55

gallon drums it had been purchasing, and the new supplier she found could only provide 4 gallon containers at a higher price.  Comeaux testified that he only told the suppliers that he would not be liable for payment on any outstanding invoices.  He did not explain why he would need to contact suppliers to tell them this.  The court finds that Comeaux did interfere with the debtor's supplier relationships, however, the debtor did not put on any evidence of how much this cost the debtor.  Because it is the debtor's burden to prove its damages, the court finds that it did not carry its burden.

Finally, the debtor alleges that it was damaged by the Petition for Writ of Mandamus, Temporary & Permanent Receivership, and Breach of Fiduciary Duties that Comeaux filed in the 17th Judicial District for the Parish of LaFourche, State of Louisiana against the debtor and its other members on October 20, 2017.  It was unclear from the testimony what effect that suit had, but it does not appear that it was successful.  Anthony Griffin testified that he had to spend $7,500 of his personal funds to defend the suit.  There was no testimony that the debtor spent its funds to defend the suit.  Further, if the state court did not award attorney's fees in connection with the suit, this court is reluctant to do so at this juncture.

In sum, it appears that the dissolution of the marriage between Comeaux and Lasseigne led to hard feelings and some less than admirable behavior on Comeaux's part.  The court did not find some of his explanations very credible, but in the end, it was the debtor's burden to show its damages and this it failed to do, so although the court finds that there may have been some tortious behavior on Comeaux's part, it cannot award any damages to the debtor.  The court also declines to award attorney's fees where the debtor did not prove its case.

9

### b.  The Claim Objection

Comeaux's claim was timely filed in the amount of $238,911.38.  The debtor does not contest the portion of the claim related to the $33,000 consent judgment entered against the debtor and in favor of Comeaux by the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana.  The debtor also does not really contest the second portion of the claim, which is related to the $153,039.19 judgment entered against the debtor and in favor of Charles Comeaux and Lois Lasseigne by the 17th Judicial District Court.  Rather, the debtor contests how much of that judgment is payable to Comeaux, and how much is payable to Lasseigne.  The final part of the claim, the $52,272.19 related to the Coastal Commerce Bank loan is fully contested by the debtor.

### i.  The judgment in favor of Comeaux and Lasseigne

The state court declined to determine how much of the $153,039.19 judgment was due to Comeaux and how much was due to Lasseigne.  The judgment was based on several loans made to the debtor during Comeaux and Lasseigne's marriage.  The parties stipulated to this court that $151,118.19 of these funds came from an account held at Capital One that initially belonged only to Comeaux, but to which Lasseigne was added as a joint account holder at some point during the marriage.  The remaining $2,521.00 came from an account held at another bank that was a joint account.

Comeaux argues that in the course of the divorce proceedings, the state court entered a Judgment on Motion to Traverse Sworn Detailed Descriptive List in which it found the Capital One account was Comeaux's separate property.  That same court, however, in its judgment against the debtor, expressly declined to determine how much of the $153,039.19 was due to Comeaux or Lasseigne.  At trial, the debtor presented evidence that a portion of the funds from

the Capital One account, in the amount of $79,015.33 were joint funds. [6] Comeaux presented

evidence to refute this, testifying that two deposits totaling $42,325.37 constituted insurance

proceeds and were not joint funds.[7] The court finds that the remaining funds, $36,689.98, which

Lasseigne testified were proceeds from co-owned rental property, child support payments to her,

tax refunds from the couple's joint tax returns, and the sale of a truck, were community funds,

and Lasseigne is entitled to half. She is also entitled to half of the $2,521 that came from the

other joint account. The court holds that Comeaux has a claim for $133,433.70 of the judgment

in the amount of $153,039.19 against the debtor.

### ii. The loan from Coastal Commerce Bank

At trial, the debtor showed that there were two versions of the initial operating agreement of

the debtor. One, Exhibit 2, which was signed by all members, lists Comeaux and Lasseigne as

co-managers of the debtor. The other, Exhibit 6, was signed only by Comeaux and lists only

Comeaux as the manager.[8] It was this second, invalid operating agreement which was presented

to Coastal Commerce Bank when the debtor first took out a loan to buy equipment on April 24,

2012. Although the operating agreement was invalid, Comeaux was nonetheless a manager of

Wow Wee under the valid operating agreement at the time the loan was initially made, and thus

he had authority to sign for the loan on behalf of the debtor. Comeaux also executed a personal

guarantee with the bank when the loan was made. Chip Ourso, the chief lending officer for the

bank testified that because of the financial situation of the debtor and the other members of the

debtor, the only reason the bank was willing to make this loan was because Comeaux agreed to

personally guarantee the loan. Ourso also testified that the loan documents provided that in the

---

[6] Trial Exhibit 35.

[7] One deposit was in the amount of 21,510.58 made on 6/12/14; the other deposit was in the amount of $20,814.79 made on 12/1/14.

[8] The parties all agree that Exhibit 6 was not a valid document.

event management or control of the Wow Wee changed, it was Wow Wee's responsibility to

notify the bank of that change.  Lasseigne conceded in her testimony that no one had notified the

bank when she became the sole manager of the debtor.

The debtor borrowed the money from the bank to buy equipment.  The loan was renewed

twice, and then converted to a three-year loan.  Comeaux's guarantee ran with the loan.  When

the loan became past due, the bank sent a demand letter to Comeaux asking him to make

payment in full under his guarantee.[9]  The letter also threatened litigation if Comeaux did not

make payment within 15 days.  Comeaux elected to fulfill his obligation under the guarantee,

and on October 30, 2018 he and the bank entered in an Act of Sale and Assignment of

Promissory Note and Related Security Agreements.  Comeaux paid the bank, the bank assigned

the Wow Wee note to Comeaux, and Comeaux replaced the bank as Wow Wee's creditor on the

equipment loan.

Wow Wee makes the argument that because Comeaux presented the bank with an invalid

operating agreement at the time of the initial loan, somehow the loan was invalid and Comeaux

should not be allowed to collect on the note the bank assigned to him when he paid of the

debtor's loan.  It argues that an action taken in the name of a corporation that is unauthorized

cannot bind the corporation.  But Comeaux was authorized under the valid operating agreement

to make the loan.  He was a manager at the time of the initial loan transaction.  And, the debtor

used the proceeds to buy equipment that benefitted the debtor, thus ratifying the transaction.  The

debtor cites no authority for its proposition that the invalid operating agreement somehow makes

this transaction unenforceable when Comeaux did have authority under the valid operating

agreement to enter into the transaction.  The court finds that the transaction was proper, and

---

[9]  Trial Exhibit 29.

Comeaux is entitled to make a claim against the debtor for the $52,272.19 he paid to the bank to purchase the note.

The court finds that Comeaux has a general unsecured claim against the debtor in the total amount of $218,705.89.  In its adversary complaint, the debtor asserted that Comeaux had filed his proof of claim in bad faith.  The debtor did not make any argument in its post-trial brief in furtherance of this claim, and the court finds that the claim was not made in bad faith.

## III.    Conclusion

For the reasons set forth in this memorandum opinion, the court finds that the debtor is not entitled to an award of damages on its complaint.  The court also finds that Comeaux is allowed a general unsecured claim against the debtor in the amount of $218,705.89.

New Orleans, Louisiana, July 27, 2020.

Jerry A. Brown
U.S. Bankruptcy Judge